UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES B. GILL, SR.,

                    Plaintiff,

        v.                                    Case No. 17-cv-873-pp

HEIDI MICHEL, J. MEKASH,
BRENT MEYER, and IAN HIGGINS,

                    Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 58), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 62), DENYING PLAINTIFF'S MOTION TO STRIKE FILINGS AND/OR MOTIONS (DKT. NO. 84) AND DISMISSING CASE**

Plaintiff Charles B. Gill, Sr., is a Wisconsin state prisoner representing himself. The court screened his complaint and permitted him to proceed on a claim that the defendants violated his First Amendment right to freely exercise his religion based on allegations that they prevented him from praying correctly for ten days while he was confined at the Brown County Jail. Dkt. No. 14 at 7. The court also allowed the plaintiff to proceed on a Fourteenth Amendment equal protection claim based on allegations that the defendants discriminated against him because of his faith. Id. at 7-8. The plaintiff has filed a motion for summary judgment, dkt. no. 58, and the defendants have filed a joint motion for summary judgment, dkt. no. 62. The court addresses these motions below.

## I. Facts

Since 1994, the plaintiff has been an American Sunni Muslim who adheres to the tenets of Islamic Faith. Dkt. No. 70 at ¶3. The plaintiff was confined at the Brown County Jail ("BCJ") from August 19, 2016 to June 9, 2017, when he was transferred temporarily to the Outagamie County Jail due to overcrowding. Id. at ¶¶7-8. Defendant Heidi Michel is a captain with the Brown County Sheriff's Office and works at the BCJ. Dkt. No. 72 at ¶12. During the plaintiff's confinement there, Michel was a lieutenant. Id. at ¶13. Defendants Correctional Officers J. Mekash, Brent Meyer and Ian Higgins work at the BCJ. Id. at ¶¶16-18. Chaplain Karen Konrad, who is not a defendant, consults as the BCJ's chaplain. Id. at ¶19.

The plaintiff received a copy of the inmate handbook and jail rules when he entered the BCJ. Dkt. No. 72 at ¶2. One of the "Recreation area (gym)" rules states: "Private inmate use of the gym is not allowed. All meetings/sessions must be approved by Jail Administration." Id. at ¶3. One of the "Dayroom" rules states, "You are not allowed to loiter around the phone, sink, water fountain, or gym entrance area. Standing in the dayroom for an unreasonable amount of time can be considered loitering." Id. The defendants construe these rules to prohibit inmate-led worship in the gym and dayroom. Dkt. No. 72 at ¶4. According to the defendants, the policies and rules against inmate-led worship in the inmate handbook and jail rules serve legitimate penological interests and are in place to prevent inmates from plotting staff assaults, escapes, or violations of prison rules. Dkt. No. 72 at ¶¶4, 5. The defendants

state that these rules are in place primarily for security reasons, such as maintaining social order, and preventing organized crime and gang activity within the jail. Id. at ¶5.

In 2017, Ramadan took place from May 26, 2017 to June 24, 2017.[1] Dkt. No. 72 at ¶9. In her declaration, defendant Michel states that BCJ staff received the plaintiff's "first" religious request on May 21, 2017, when he asked for a prayer blanket for Ramadan. Dkt. No. 64 at ¶10. She stated that the next day, May 22, the plaintiff made a request for a Halal diet. Id. at ¶22. Michel averred that these requests were denied "due to no mention of [the plaintiff's] Islamic faith at the time of booking." Id. Despite that fact, Michel says that she "reached out" to Chaplain Karen Konrad, who met with the plaintiff and approved his dietary request. Id. at ¶13. Konrad confirmed in her declaration that she received the requests for the prayer towel and the Halal diet on May 22, 2017. Dkt. No. 66 at ¶10. Konrad stated that she interviewed the plaintiff the same day, concluded that he had a basic understanding of some of the core beliefs of the Islamic faith, granted his request for a Halal diet and provided him with a prayer towel. Id. at ¶¶11-13.

The plaintiff states that from May 26, 2017 (the first day of Ramadan) to the afternoon of May 31, 2017, defendant Officer Higgins allowed him to pray

---

[1] "Ramadan is a month of the Islamic calendar revered by Muslims as the anniversary of the revelation of the first verses of the Quran. During Ramadan, Muslims fast from sunrise to sunset." Easterling v. Pollard, 528 F. App'x 653, 655 (7th Cir. 2013).

in the gym.[2] Dkt. No. 70 at ¶4. On May 31, 2017, defendant Officer Meyer told the plaintiff to pray in his cell and did not let the plaintiff pray the last three prayers of that day in the gym. Id. at ¶5. On June 4, 2017, Higgins told the plaintiff to pray in his cell. Id. at ¶7.

That day—June 4, 2017—the plaintiff filed grievance #2017-001125. Dkt. No. 70 at ¶6. In the grievance, the plaintiff alleged that the BCJ offered services to Christians, who could pray in the gym, but not to Muslims. Dkt. No. 72 at ¶27. He also alleged that, as a Muslim, he could not pray in his cell because he would have to pray next to a toilet. Id.

In her declaration, Konrad stated, "Over the years, I contacted Imams— religious leaders in the Muslim community—at mosques in Green Bay, Appleton, and Milwaukee to enquire if they would come to the BCJ to lead prayer services. Each Imam declined." Dkt. No. 66 at ¶14. Konrad attested that she'd also asked the Imams about whether Islamic prayer rules "prohibited an inmate from praying on their own, in their cell, due to the presence of a toilet." Id. at ¶15. She stated,

> 16.    Based on my conversations with the Green Bay Mosque Imam, Appleton Mosque Imam, and the Milwaukee Mosque Imam; my understanding was that Islamic rules did not prohibit [the plaintiff] from praying in his cell because the Islamic god, Allah, would be understanding about [the defendant's] circumstances while praying.

> 17.    The Imams stated that he could pray in his cell if he kept it clean and prayed as far away from the toilet as possible, and they also said that laying something over the top was an option as well.

---

[2] The defendants object to this proposed fact as impermissibly vague because the term "allowed" is ambiguous. Id.

Id. at ¶¶16-17.

In her declaration, Michel stated, "On June 4, 2017, [the plaintiff] filed a grievance against BCJ for not offering Islamic prayer services, and Correctional Officer Mekash met with [the plaintiff] after I spoke to the Chaplain." Dkt. No. 64 at ¶14. This statement doesn't provide a clear chronology, but it appears that after Michel saw the plaintiff's complaint, she contacted Konrad. Michael indicates that Konrad told her about reaching out to Imams in Green Bay and Milwaukee, and about the information the chaplain had learned from them. Id. at ¶¶15-16. The chaplain also told Michel that she'd tried to get Islamic leaders to come lead services at BCJ but had been unsuccessful. Id. at ¶16. Michel attested that she'd "reported back to correctional officer ("CO") Mekash before his meeting with [the plaintiff]." Id. at ¶17. Konrad confirmed in her declaration that she'd "discussed the June 4, 2017, grievance and what [she] learned from the Imams with then-Lieutenant Michel." Dkt. No. 66 at ¶18.

Defendant Officer Mekash attested that he reviewed the plaintiff's grievance. Dkt. No. 65 at ¶6. Mekash averred that he explained to the plaintiff that the BCJ didn't have a volunteer to lead Islamic services in the gym or dayroom, but asked the plaintiff to let the chaplain know if the plaintiff knew of anyone who qualified. Id. at ¶¶7-8. He also explained to the plaintiff the policy that prohibited inmates from using the gym or the dayroom for individually-led services. Id. at ¶9. Finally, he stated that he relayed to the plaintiff the chaplain's information about the Imams' views of performing prayers ina  call with a toilet. Id. at ¶10. He suggested that the plaintiff put something in front

5

of the toilet to block it, and concluded that the plaintiff's grievance was unfounded. Id. at ¶¶11-12. The plaintiff's proposed findings of fact indicate that during this meeting with Mekash, the plaintiff "explained to Mekash about Catholics praying and taking communion in the gym." Dkt. No. 60 at ¶9.

On June 5, 2017, the plaintiff appealed the ruling. Id. at ¶11. Michel says that she reviewed the appeal and concluded that it was unfounded. Dkt. No. 64 at ¶20. Michel attached the grievance and the summary showing her response to her declaration. Dkt. No. 64-2. The summary shows that Michel responded to the appeal as follows:

> Mr. Gill, I am in receipt of your appealed grievance. I understand your frustration however we are not denying your right to practice your religion. We do not allow inmate led religion practices that is why you cannot utilize the gym for praying. The other religions you reference are actually ran by the jail ministry. We have attempted many times to obtain someone from the Muslim faith to volunteer in our facility but we have not had any success. As far as your concern with praying by the toilet, we have investigated this matter and many of the leaders in the Muslim religion have indicated that is preferred not to pray by a toilet but exceptions can be made—the important thing is to pray no matter where you are. Grievance is closed and unfounded.

Id. at 3.

The plaintiff states in his proposed findings of fact that he told both Michel and Mekash that it was forbidden for him to pray next to a toilet. Dkt. No. 60 at ¶17. Catholics could pray and take communion in the gym because they were led by an outside religious leader. Id. at ¶18. The plaintiff states that he felt "emotional as well as felt some type of prejudice" because of his religion, because the Catholics could pray in the gym and he could not. Id. at ¶20.

The plaintiff states in his declaration that from May 31, 2017 until his June 9, 2017 transfer to the Outagamie County Jail, he was not allowed to pray correctly at the BCJ, and that he was forced to miss forty-eight prayers during the month of Ramadan. Dkt. No. 61 at ¶19. He says that while at the Outagamie County Jail, he prayed in the dayroom without a problem. Id. ¶20.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.     The Plaintiff's Motion for Summary Judgment (Dkt. No. 58)

The plaintiff's brief asserts that the court should not grant summary judgment to Michel, Mekash, Meyers or Higgins because he told each of them that praying next to a toilet was forbidden in Islam, but they ignored him. Dkt. No. 59 at 1. He says that the court should deny summary judgment to Michel and Mekash because they admitted that they allowed Catholics to pray in the gym, but didn't allow the plaintiff to do so. Id. He asserts that the defendants are not entitled to qualified immunity. Id. at 2. Finally, he asserts that the court should grant judgment in his favor, award him punitive and compensatory damages and order the BCJ to "change its policies to allow all faiths to pray and meet in the gym like Catholics do without reprisal." Id.

The plaintiff's brief in support of his motion contains a brief statement of facts, id. at 2, a list of the Islamic requirements of prayer, id., a description of his participation in Ramadan, id. at 3, the summary judgment standard of review, id., and a section entitled "Conclusions of Law," id. Under the "Conclusions of Law" section, the plaintiff has a number of sub-sections, including "Wis. Stat. § 227.10," id. at 4, and "RLUIPA," id. at 5.

Wis. Stat. §227.10(2) says that no agency may promulgate a rule that conflicts with state law. Section (2m) says that an agency can't implement or

8

enforce a standard, requirement or threshold unless that standard, requirement or threshold is required or permitted by statute or rule.

This is a state law. Federal courts do not have jurisdiction to decide state-law claims, unless they have jurisdiction to decide a federal claim and the state claim is "so related to claims in the action within [the court's federal] jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367. The court did not allow the plaintiff to proceed on a claim under Wis. Stat. §227.10. <u>See</u> Dkt. No. 14. Even if it had, the plaintiff has not identified an agency that promulgated a rule, or identified a rule, that conflicts with state law. He identifies certain polices, like the policy prohibiting inmates from praying on their own in the gym or the dayroom, but does not state a claim that that policy is not permitted by statute or rule. The court has allowed him to proceed only on his claims that individual state officials violated his constitutional rights. There is no basis for the court to grant summary judgment in favor of the plaintiff based on Wis. Stat. §227.10.

Nor did the court allow the plaintiff to proceed on a claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§2000cc, *et seq*. <u>See</u> Dkt. No. 14. Even if it had, the RLUIPA "does not create a cause of action against state employees in their personal capacity." <u>Grayson v. Schuler</u>, 666 F.3d 450, 451 (7th Cir. 2012) (citing <u>Nelson v. Miller</u>, 570 F.3d 868, 886-89 (7th Cir. 2009)). "[I]njunctive relief is the sole remedy for a RLUIPA claim." <u>West v. Grams</u>, 607 Fed. App'x 561, 565 (7th Cir. 2015) (citing <u>Grayson</u>, 666

F.3d at 451). Once a plaintiff has been released from the facility where his rights allegedly were violated, any official capacity injunctive relief claims he may have had (such as this plaintiff's request that the court order the BCJ to change its policies to allow all faiths to meet and pray in the gym) become moot, and he may pursue only "his personal-capacity damages claim under section 1983." Grayson, 666 F.3d at 451. At the time the plaintiff filed this lawsuit, he was no longer in the BCJ (he was in the Outagamie County Jail), so he cannot not pursue an official capacity claim for injunctive relief under the RLUIPA.

The plaintiff also included in his brief a subsection entitled "Discovery." Dkt. No. 59 at 6. In this section, he asserts that on October 8, 2018, defendant Michel signed a sworn document attesting that the answers she had provided to the plaintiff's interrogatories were true. Id. He asserted that Michel's answer to three of the plaintiff's interrogatories stated that she consulted with the BCJ chaplain and spoke to Imams in Milwaukee and Green Bay. Id. He says that Michel also represented in her response to his grievance appeal that she'd consulted with Muslim leaders regarding the question of praying near a toilet. Id. The plaintiff alleges, however, that in another place, Michel "clearly admits in diametric opposition she never spoke to any Islamic Leader from the Muslim Community." Id. The plaintiff asserts that Michel lied, and that on this basis alone, the court should grant summary judgment in his favor as to Michel. Id. at 6, 8. He cites the Supreme Court's decision in Scott v. Harris, 550 U.S. 372, 380 (2007) for the proposition that when opposing parties tell two different

stories, and one version is blatantly contradicted by the record so that no reasonable jury could believe it, the court should not adopt the contradicted version for the purpose of ruling on a summary judgment motion. Id. at 3.

The plaintiff attached to his motion three pages—pages 5-6 of what appear to be someone's responses to interrogatories and page three of what appear to be responses to his requests to admit. Dkt. No. 59-1. The plaintiff asserts that these are pages from *Michel's* responses to his interrogatories and requests for admission, but there is no way for the court to confirm that as to the first two pages. The first page contains Interrogatory No. 12, in which the plaintiff asked, "Did you even try to Google the fact that it is forbidden/Haraam (No Permissible) for Mr. Gill to pray in a place like graveyards, bathrooms or places that there is no walls and doors between the bathroom and a regular room?" Id. at 1. The response contains an objection, and the statement "[s]ubject to and notwithstanding that objection, I consulted the jail's chaplain and spoke to imams in Milwaukee and Green Bay." Id. The second page contains Interrogatory No. 15, "Please explain how you investigated this matter as you stated in the Grievance Appeal 2017-001125." Id. at 2. The response indicates, "I consulted the jail's chaplain and spoke to imams in Milwaukee and Green Bay." Id. It also contains Interrogatory No. 16, which asks the respondent to list the names and contact information of all the Muslim leaders "whom you spoke with in your investigation who indicated that it is preferred not to pray by a toilet by exceptions can be made—the important thing is to pray no matter where you are." Id. The response indicates, "I do not know the

names, addresses, and phone numbers of all the Muslim leaders with whom I spoke regarding the subject matter in this Interrogatory. Discovery is ongoing." Id.

The third page refers to Michel, saying in response to a request for admission which does not appear in the document that "the information known or readily obtainable by Michel is insufficient to enable her to admit or deny the accuracy of the date referenced in this Request." Id. at 3. The court can infer from that statement that the third page is from Michel's responses to the plaintiff's requests for admission. The last request on that page states, "Admit that you never spoke with an Islamic Leader from the Muslin [sic] Community. If you did, please list their name, address and phone number." Id. The word next to "RESPONSE" is "Admit." Id.

In their opposition brief, the defendants indicate that Michel's responses and declarations "were clear when considering all the evidence, as Chaplain Konrad's declaration states that she reached out to Imams after being contacted by then-Lieutenant Michel." Dkt. No. 69 at n.2.

The court cannot conclude from the plaintiff's attachments that Michel lied. The documents the plaintiff attached are not evidence, nor is there proof that they are Michel's responses. The evidence before the court includes Michel's declaration (which does not indicate that she, personally, spoke to any Imams) and her response to the plaintiff's grievance appeal (which again does not indicate that she personally spoke any imams; she uses the word "we" in referring to BCJ staff). Even if Michel had represented to the court that she,

and not Konrad, had spoken to the area Imams, that fact would be concerning, but would not require the court to grant summary judgment in favor of the plaintiff. The question of who spoke to the Imams is not material to whether the named defendants violated the plaintiff's rights to freely exercise his religion or to equal protection.

The remainder of the plaintiff's summary judgment arguments relate to the merits of the claims the court allowed him to pursue, and the court will consider them as part of its consideration of the defendants' motion for summary judgment.

C.   The Defendant's Motion for Summary Judgment (Dkt. No. 62)

1.   *The Parties' Arguments*

In their opposition to the plaintiff's motion for summary judgment, the defendants contend that as to his First Amendment claim, the plaintiff has not demonstrated that the BCJ's policy prohibiting inmates from praying alone in the gym or the dayroom placed a substantial burden on his religious practices. Dkt. No. 69 at 5. They assert that the plaintiff has not shown how the alleged impingement targeted a specific religion or religious practice. Id. The defendants explain that the plaintiff could pray in his cell and that he had the ability to clean his jail cell and toilet according to his own standards. Id. at 5-6. The defendants also point out that Chaplain Konrad communicated with Muslim leaders and confirmed that the plaintiff's ability to pray in his cell was not contrary to Islamic law. Id. at 6.

They argue that for both his First and Fourteenth Amendment claims, the plaintiff has not demonstrated that the burden on his rights was not reasonably related to a legitimate penological interest. Id. They assert that security and economic concerns are the reason for the policy against inmate-led prayer in the gym or dayroom. Id.

In their brief in support of their own motion for summary judgment, the defendants contend that the plaintiff cannot prove a First or Fourteenth Amendment claim of unequal or disproportionate treatment because the Constitution does not require prison officials to treat all religious sects the same. Dkt. No. 63 at 7. They also contend that the plaintiff has not demonstrated that their conduct deprived the plaintiff of a reasonable opportunity to pursue his faith. Id. at 8. The defendants argue that the plaintiff's First Amendment free exercise claim fails as a matter of law because the jail's policy against inmate-led worship in common areas did not impose a substantial burden on the plaintiff's religious rights,[3] id. at 9-10, 11-12, and because the jail's policy was reasonably related to legitimate penological interests, including maintenance of security, institutional order, and staff safety, id. at 12-13. Finally, the defendants contend that they are entitled to qualified immunity. Id. at 13-15.

The plaintiff contends in his opposition brief that the defendants have provided no evidence that there was a written policy prohibiting inmate-led

---

[3] As explained below, in their summary judgment reply brief the defendants acknowledge that not being able to pray in the gym or the day room *did* place a substantial burden on the plaintiff's religious practice. Dkt. No. 78 at 4.

religious practices in the gym or day room. Dkt. No. 72 at 2-3. He also argues that the restriction that he had to pray in his cell substantially burdened the practice of his religion because his sincerely held religious beliefs prohibit him from praying in a room with a toilet, and required him to pray five times a day. Id. at 4. The plaintiff states that the defendants' refusal to allow him to pray somewhere other than his cell required him either to forgo the prayers or pray in a manner that violated his religious beliefs. Id. The plaintiff also states that while he could clean his cell daily between 5:30 a.m. and 10:30 a.m., he could not clean his cell after that so if he or his cellmate used the toilet after 10:30 a.m., he would have to pray in an area with urine and/or feces around him. Id. at 7.

2. *Analysis*

a. Plaintiff's Requests for Declaratory and Injunctive Relief

In their motion for summary judgment, the defendants argue that the plaintiff's claims for injunctive and declaratory relief are moot because he is no longer at BCJ. Dkt. No. 63 at 7. The plaintiff does not appear to dispute this, responding that he never asked for injunctive or declaratory relief. Dkt. No. 72 at 5. The plaintiff is mistaken on that point; the "Relief Wanted" section of the complaint includes the statement that the plaintiff would like BCJ "to change their policy and allow all faiths to pray and meet in the gym like the Catholics do without reprisal." Dkt. No. 1 at 7.

The plaintiff was confined at BCJ in 2016-2017; his request for injunctive relief is moot because he is no longer there. See Maddox v. Love, 655

F.3d 709, 716 (7th Cir. 2011); <u>Nelson</u>, 570 F.3d at 882-83, abrogated on other grounds by, <u>Jones v. Carter</u>, 915 F.3d 1147 (7th Cir. 2019). The court will grant summary judgment in favor of the defendants as to those requests.

        b.      First Amendment Free Exercise of Religion Claim

Prisoners have a limited right to exercise their religion under the First Amendment. <u>See</u> <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348-49 (1987); <u>Turner v. Safley</u>, 482 U.S. 78, 89-91 (1987); <u>Tarpley v. Allen Cty.</u>, 312 F.3d 895, 898 (7th Cir. 2002). To establish a Free Exercise violation, the plaintiff must demonstrate that the defendants' actions "placed a substantial burden on [his] religious practices." <u>Thompson v. Holm</u>, 809 F.3d 376, 379 (7th Cir. 2016). A substantial burden "put[s] substantial pressure on an adherent to modify his behavior and to violate his belief." <u>Id.</u> (quoting <u>Thomas v. Review Bd.</u>, 450 U.S. 707, 717-18 (1981)). "A burden is unjustified if it is not reasonably related to a legitimate penological interest." <u>Id.</u> (citing <u>Turner</u>, 482 U.S. at 89-91).

The defendants acknowledge that the plaintiff has demonstrated that "not being able to pray in the gym or dayroom 'placed a substantial burden on his religious practices.'" Dkt. No 78 at 4. By not allowing the plaintiff to pray in the gym or day room, and by telling him that he had to pray in his cell, the defendants forced the plaintiff to choose between not praying or violating a central tenet of his religious belief by praying in his cell next to toilet. <u>See</u> <u>Thompson</u>, 809 F.3d at 380; <u>see also</u> <u>Jackson v. Raemisch</u>, 726 F. Supp. 2d 991, 999 (W.D. Wis. 2010) ("The question is not whether a restriction places a

substantial burden on an average adherent, but whether the *plaintiff* is substantially burdened in practicing his sincerely held beliefs."); Ortiz v Downey, 561 F.3d 664, 669 (7th Cir. 2009) ("A person's religious beliefs are personal to that individual; they are not subject to restriction by the personal theological views of another.").

The defendants contend, however, that the plaintiff cannot meet his burden at summary judgment because (1) his religious belief was not sincere, dkt. no. 63 at 10-11; (2) "prayer within one's cell is an adequate alternative that is not considered a substantial burden on an inmate," dkt. no. 78 at 4; and (3) the plaintiff "did not even attempt to demonstrate that the policy was not reasonably related to a legitimate penological interest, because there is no argument to refute the asserted interests," id. at 4-5.

"A prison is entitled to ensure that a given claim reflects a sincere religious belief, rather than a . . . prisoner's desire to make a pest of himself and cause trouble for his captors." Vinning-El v. Evans, 657 F.3d 591, 594 (7th Cir. 2011). The defendants question the sincerity of the plaintiff's religious beliefs because he did not mention them, or his religious affiliation, when he arrived at the jail, and instead "did not make a request regarding Ramadan until after the first week of Ramadan[.]" Dkt. No. 63 at 11. But the defendants have not disputed the plaintiff's assertion that he has been a practicing Muslim since 1994. And contrary to the defendants' assertion, the plaintiff requested Ramadan meals a few days *before* the start of Ramadan in 2017. Ramadan began on May 26, 2017, and the plaintiff asked for a Halal meal on May 21 and

for a prayer rug on May 22. Konrad interviewed the plaintiff, approved his request for Ramadan meals based on his knowledge of Islamic faith core beliefs, and issued him a prayer towel. The facts do not support the defendants' claim that the plaintiff did not have a sincere belief, or that the defendants did not believe that he had sincere religious belief.

That leaves the question of whether the defendants had a legitimate penological justification for requiring the plaintiff to pray in his cell. In deciding whether restrictions are reasonably related to legitimate penological interests, the court considers four factors: (1) whether a valid, rational connection exists between the policy and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates, and the allocation of prison resources; and (4) whether obvious, easy alternatives exist as evidence that the regulation is not reasonable. Turner, 482 U.S. at 89–91.

Under the first factor, "the governmental objective must be a legitimate and neutral one" and "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Id. at 89-90. Legitimate penological interests can include security and economic concerns. Ortiz, 561 F.3d at 669. Prisons "need not . . . allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more

likely merely recognize) a leadership hierarchy among the prisoners." <u>Johnson-Bey v. Lane</u>, 863 F.2d 1308, 1310 (7th Cir. 1988).

The defendants contend that security and economic concerns are major factors in the jail's rules prohibiting inmate-led prayer in the gym or dayroom, and that the jail is entitled to enforce policies that prevent gang-related activity and organized crime from taking place within the jail. Dkt. No. 69 at 6. They explain that the jail's policies and rules require that a non-inmate lead religious practices in the day room and gym areas because the involvement of a non-inmate helps ensure that such meetings will not lead to organized crime or gang activity, or other plots that a congregation of inmates could devise if left unsupervised in large groups. <u>Id.</u>

The court first notes that the jail's gym and dayroom rules do not mention inmate-led prayer. The gym rule state that no "private inmate use" is permitted and the dayroom rule states that loitering is not permitted. The *defendants* have interpreted these rules as a ban on inmate-led religious services or inmate-led worship. It is not clear whether the defendants also interpret the rules as prohibiting the plaintiff from praying by himself in those locations. But the economic and security justifications the defendants provide relate to prohibiting an inmate from leading group worship or prayer in the gym or dayroom. The court cannot conclude that the plaintiff praying by himself in one of those areas would raise concerns of inmate plots, gang-related activity or organized crime, and the defendants do not provide any security or

economic justification for prohibiting an inmate from praying by himself in these areas.

Turner's second factor is whether there are alternative means of exercising the right in question that remain available. Where an inmate has "other avenues" to exercise the asserted right, the court must "be particularly conscious of the 'measure of judicial deference owed to corrections officials … in gauging the validity of the regulation.'" Turner, 482 U.S. at 90 (citing Pell v. Procunier, 417 U.S. 817, 827 (1974)). The defendants contend that prayer in one's cell "is an adequate alternative that is not considered a substantial burden on an inmate." Dkt. No. 78 at 4. The defendants cite to McRoy v. Cook Cty. Dep't of Corr., 366 F. Supp. 2d 662, 677 (N.D. Ill. 2005), aff'd *sub nom.* McRoy v. Sheahan, 205 F. App'x 462 (7th Cir. 2006), in which the court determined that a county correctional facility had a legitimate security interest in cancelling Muslim services, along with other religious services and group activities, during division lockdowns and staff shortages due to concerns related to prison security. McRoy, 366 F. Supp. 2d at 675-76. The McRoy court also determined that the prisoner had an alternative means of exercising his religious right because he could pray in his cell *and* in the dayroom, and because the prisoner had not alleged or argued that solitary prayer in his cell or group prayer in the dayroom were insufficient alternatives to communal services for the exercise of Muslim faith. Id. at 676-77.

The plaintiff's case is distinguishable from the facts in McRoy; here, the plaintiff alleges and argues that prayer in his cell is *not* an adequate alternative

to praying in the gym or dayroom because praying next to a toilet violates his religious beliefs. While in-cell prayer (and prayer in the dayroom) may have been adequate alternatives to group prayer in <u>McRoy</u>, in this case in-cell prayer next to a toilet was not an adequate alternative to prayer in the gym or day room. The plaintiff did not pray for ten days and he says that he missed forty-eight prayers during Ramadan. Dkt. No. 61 at ¶21.

The court does not have enough information to evaluate <u>Turner's</u> third and fourth factors. Under the third factor, the court considers whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates and the allocation of prison resources. As explained above, the defendants' justification for the rule against inmate-led worship appears to be based on an inmate leading one or more other inmates in prayer or religious services, and not on the plaintiff praying by himself. Perhaps allowing the plaintiff to pray alone in the gym or dayroom would have some negative impact on guards, other inmates and prison resources. Perhaps allowing an inmate to pray in the gym or dayroom would interfere with the activities of the other inmates, such as watching TV or reading. Perhaps it would require an additional guard, to protect the plaintiff from interference by other inmates. Perhaps it would be too much of a burden on jail staff for the plaintiff to travel back and forth from his cell to the gym or dayroom five times a day—as early as 4:30 or 5:00 a.m. for the first prayer of the day and as late as 9:30 or so for the last one; it might interfere with counts or meals or job scheduling or visitation hours. But the defendants have not said as much.

They have not addressed at all why the plaintiff could not pray alone in the gym or dayroom; they appear to assume that the only way to accommodate the plaintiff's request to pray somewhere other than his room would be to allow him to pray in an inmate-led group with others.

Turner's fourth factor states that the court should consider whether obvious, easy alternatives exist as evidence that the regulation is not reasonable. It is possible that there might be obvious, easy alternatives to requiring the plaintiff pray in his cell. Perhaps he could have prayed alone in the gym or the dayroom. Perhaps he could have carried his prayer rug with him during the day, and prayed wherever he happened to be at the appropriate time. The court does not know, because the defendants did not discuss this factor.

The court notes that the plaintiff is not the first inmate to have raised this issue. In Jihad v. Fabian, 680 F. Supp. 2d 1021 (D. Minn. 2010), the inmate plaintiff argued that because there was no Muslim chaplain and there were only two Islamic services a week, the facility's requirement that an approved volunteer to be present during services substantially burdened his First Amendment rights. Id. at 1026-27. The plaintiff further alleged that his sincerely-held religious beliefs prevented him from praying in a room with a toilet—his cell. Id. at 1027. The Jihad court concluded that "the safety of prison inmate and staff would be jeopardized by the increased movement of prisoners if inmates were allowed to leave their cells five times a day to pray," and that the facility's policy of allowing an inmate to pray either during

scheduled worship services or in his cell "was the least restrictive means of achieving the defendants' compelling interest in safety and security." Id. The defendants could have presented evidence regarding the difficulties or burdens imposed by inmate movement, but did not. And unlike the facility in Jihad, the BCJ has *no* Islamic services at all.

The plaintiff in Ahmad v. Ehrman, 339 F. Supp. 2d 1134 (D. Colorado 2004), reversed on other grounds, Ahmad v. Furlong, 435 F.3d 1196 (10th Cir. 2006), also argued that being forced to pray in his cell, near the toilet, violated his sincerely held religious beliefs. The district court concluded that the plaintiff had a reasonable alternative—he could participate in group prayer every Friday. Id. at 1138. Again, the plaintiff here did not have that alternative available to him.

On this record, the court cannot conclude as a matter of law at the defendants' requirement that the plaintiff pray in his cell was reasonably related to a legitimate penological interest.

### c. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause prohibits state actors from purposefully treating an individual differently because of his membership in a particular class. DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000). A legitimate secular reason for any difference in treatment is fatal to the plaintiff's claim. Kaufman v. McCaughtry, 419 F.3d 678, 683 (7th Cir. 2005); Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir. 1988) (difference in treatment must only be non-arbitrary). To prevail on his equal protection claim, the plaintiff must show that

defendants refused to allow him to pray in the gym or the day room because he is a Muslim, rather than because they believed that allowing him to pray in either place created a security risk. Jackson, 726 F. Supp. 2d at 1005 (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("Where the claim is invidious discrimination . . . our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose" and that defendant "undert[ook] a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.")); see also West v. Kingsland, 679 F. App'x 482, 485 (7th Cir. 2017) (to avoid summary judgment, plaintiff needs evidence that the defendants acted with discriminatory purpose, meaning that their actions were motivated at least partly by a desire to adversely affect Muslims).

The defendants have not disputed that Catholics could pray and take Communion in the gym; they assert only that the reason Catholic could pray and take Communion in the gym is because they were led by non-inmates. The defendants argue that they—Konrad, specifically—tried to find a non-inmate to lead Islamic services at the BCJ, but were unable to do so. The court cannot conclude on this record that the defendants singled out Muslims. Rather, religious groups that had an outside leader could participate in religious services in the gym or dayroom, and religious groups that did not have an outside leader could not. It is unfortunate that the BCJ has been unable to find a non-inmate to lead Muslim worship services, but that inability does not

constitute discrimination against Muslims. The court will grant the defendants'
motion for summary judgment on the plaintiff's equal protection claim.

d. Qualified Immunity

The defendants have argued that they are entitled to qualified immunity.
Qualified immunity "protects government officials from suit for damages when
their conduct does not violate clearly established statutory or constitutional
rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a
state official is entitled to qualified immunity involves two inquiries: "(1)
whether the facts, taken in the light most favorable to the plaintiff, make out a
violation of a constitutional right, and (2) whether that constitutional right was
clearly established at the time of the alleged violation." Williams v. City of Chi.,
733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the
negative, the official is entitled to summary judgment.

Courts may address the two prongs of qualified immunity in either order.
Pearson, 555 U.S. at 236. A right is clearly established if a "reasonable official
would have understood what he is doing violates that right." Reichle v.
Howards, 566 U.S. 658, 664 (2012) (internal quotations and brackets omitted).
"[T]he crucial question [is] whether the official acted reasonably in the
particular circumstances that he or she faced." Kemp v. Liebel, 877 F.3d 346,
351 (7th Cir. 2017)). In this case, the relevant question is whether the plaintiff
had a clearly established constitutional right to pray outside of his cell in the
gym or dayroom when, based on his sincere religious belief, he could not pray
in his cell. See Kemp, 877 F.3d at 352-53 (right allegedly violated must be

defined at the appropriate level of specificity and, outside of an obvious case, generalized <u>Turner</u> framework cannot create clearly established law).

Because the defendants have raised a qualified immunity defense, the plaintiff must show that it was clearly established in the law that prohibiting him from praying in the gym or dayroom, and requiring him to pray in his cell, violated the Free Exercise Clause. <u>Mannoia v. Farrow</u>, 476 F.3d 453, 457 (7th Cir. 2007); <u>Alexander v. City of Milwaukee</u>, 474 F.3d 437, 446 (7th Cir. 2007). The plaintiff must point to a Supreme Court case, a case from the Seventh Circuit or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." <u>Wilson v. Layne</u>, 526 U.S. 603, 617 (1999). Or, the plaintiff may show that "a general constitutional rule already identified [applies] with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." <u>Michael C. v. Gresbach</u>, 526 F.3d 1008, 1017 (7th Cir. 2008).

In <u>Jackson</u>, 726 F. Supp. 2d at 1003, the Islamic prisoner plaintiff raised a genuine issue of material fact regarding whether the prison's "no prayer" rule, which prevented him from praying at his prison job and resulted in his missing one or more of his five daily prayers, violated his rights under the Free Exercise Clause. But the court determined that the defendants were entitled to qualified immunity because the plaintiff pointed to no Supreme Court or Seventh Circuit precedent to show that the defendants should have known that they were acting unlawfully. <u>Id.</u> at 1003-04.

The plaintiff has cited no cases from the Supreme Court or the Seventh Circuit to show that the defendants should have known that they were acting unlawfully when they did not let him pray in the gym or dayroom for ten days, forcing him to pray in his cell near the toilet. The court has been unable to find case law from the Supreme Court or from this circuit to show that the defendants should have known that they violated the plaintiff's constitutional rights. While the court has identified two district court cases from other districts, those cases did not address head-on the situation in which a Muslim inmate had no alternative but to pray in his cell, and neither case is binding in Wisconsin. The evidence demonstrates that the defendants believed that they were accommodating the plaintiff—Konrad had talked to Imams, had tried to get someone in to lead Islamic services and had asked whether prayer in the cell was acceptable. The plaintiff received a Halal meal and a prayer rug. Makesh suggested that the plaintiff block the toilet with something when he prayed. There is no indication that the defendants had reason to believe that they were violating the plaintiff's right to freely exercise his religion.

The defendants are entitled to qualified immunity. The court will deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment on the plaintiff's free exercise claim.

## III.    Plaintiff's Motion to Strike (Dkt. No. 84)

The plaintiff filed a motion to strike all filings and/or motions by Attorney Kyle R. Moore. Dkt. No. 84. The plaintiff stated that he recently had received a letter stating that Attorney Moore had withdrawn from representing the

defendants because he was no longer with the defendants' law firm. Id. at 1. The defendants filed a response, dkt. no. 85, in which they point to Attorney Moore's June 7, 2019 Notice of Withdrawal Counsel, dkt no. 83. The defendants explained that Attorney Samuel C. Hall and Benjamin A. Sparks remain on as lawyers for the defendants. Dkt. No. 85. Attorneys Hall and Sparks have continuously represented the defendants in this case since they filed their notices of appearance, and they have submitted and signed all filings on behalf of the defendants. Id. at 1-2. The fact that one of several attorneys representing the defendants has left the firm does not invalidate that attorney's filings. There is no basis for striking any case filings and the court will deny the plaintiff's motion.

**IV. Conclusion**

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 58.

The court **GRANTS** the defendants' motion for summary judgment and will enter judgment accordingly. Dkt. No. 62.

The court **DENIES** the plaintiff's motion to strike filings and/or motions filed by Attorney Kyle R. Moore. Dkt. No. 84.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a

party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. <u>See</u> Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 16th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**